```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION

PIERRE HARRIS,                      )
                                    )
            Plaintiff,              )
                                    )
      v.                            )     No. 4:07 CV 656 DDN
                                    )
AMERICAN MODERN HOME                )
INSURANCE COMPANY,                  )
                                    )
            Defendant.              )
```

**MEMORANDUM AND ORDER**

This action is before the court on the motion of defendant American Modern Home Insurance Company (AMHIC) for summary judgment (Doc. 37). The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 8.) A hearing was held on April 23, 2008.

## I. BACKGROUND

Plaintiff Pierre Harris commenced this action in the Circuit Court of the City of St. Louis. In his state court petition, Harris alleges that the home he owned on 3430 Grace Avenue (Grace Ave. property), was damaged by a windstorm and hailstorm on July 19, 2006. (Doc. 1 at ¶¶ 1, 4.) Harris alleges he made a claim on the property insurance policy issued by AMHIC and that AMHIC paid him $5,735.60 after its claim representative, Arthur Smith, investigated the damage. (Id. at ¶ 6.) According to the petition, John Grimes, an outside appraiser appointed by Harris, also conducted an investigation, and estimated the damages at $75,490.86. (Id. at ¶¶ 9, 20.) Harris alleges that AMHIC failed to pay the full amount of the claim, breaching the terms of the insurance policy. (Id. at ¶ 24.) In the Count 1 claim for breach of the policy contract plaintiff Harris seeks recovery of $75,490.86. Harris also alleges a Count 2 claim for statutory penalties for vexatious refusal to pay under Mo. Rev. Stat. § 375.420. (Doc. 1 at 13.)

Insurer AMHIC removed the action to this court, invoking diversity of citizenship subject matter jurisdiction under 28 U.S.C. §§ 1332 and 1441(a). AMHIC alleges that it is incorporated in Ohio, with its principal place of business in Ohio, and that Harris is a Missouri

citizen. (Doc. 1 at ¶¶ 2, 3.) AMHIC further alleges that the aggregate of Harris's two claims exceeds $75,000. (Id. at ¶¶ 4, 5.)

AMHIC denies Harris's claims and counterclaims for a declaratory judgment that Harris did not comply with the provisions of the policy and is therefore barred from recovery. (Id. at ¶¶ 20-22.) AMHIC also seeks to recover from Harris its payment of $5,735.60. (Id. at ¶ 24.)

## II. SUMMARY JUDGMENT

Summary judgment must be granted when the pleadings and proffer of evidence demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986); Devin v. Schwan's Home Serv., Inc., 491 F.3d 778, 785 (8th Cir. 2007). The court must view the evidence in the light most favorable to the nonmoving party and accord it the benefit of all reasonable inferences. Devin, 491 F.3d at 785. A fact is "material" if it could affect the ultimate disposition of the case, and a factual dispute is "genuine" if there is substantial evidence to support a reasonable jury verdict in favor of the non-moving party. Die-Cutting Diversified, Inc. v. United Nat'l Ins. Co., 353 F. Supp. 2d 1053, 1054-55 (E.D. Mo. 2004).

Initially, the moving party must demonstrate the absence of an issue for trial. Celotex, 477 U.S. at 323. Once a motion is properly made and supported, the nonmoving party may not rest upon the allegations in its pleadings but must instead proffer admissible evidence that demonstrates a genuine issue of material fact. Fed. R. Civ. P. 56(e); Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 800 (8th Cir. 2004); Krein v. DBA Corp., 327 F.3d 723, 726 (8th Cir. 2003).

## III. STATEMENT OF UNDISPUTED FACTS

The record before the court indicates that the following facts are not disputed. On July 15, 1996, Pierre Harris, and his wife, Denise Harris, jointly purchased 3430 Grace Avenue. (Doc. 38, Ex. 1.) On December 8, 1997, the Harrises jointly transferred title to the property to Valerie Ann Lane, acting as trustee. The document indicates that the Harris' address was then 12931 Dunstone, Florissant, Missouri. (Doc. 38, Ex. 2.) On October 18, 2003, Lane, as trustee, transferred title to the property to Future Investors of Harris and Harris (FIHH). Pierre

Harris signed the warranty deed on behalf of FIHH.  (Doc. 38, Ex. 3.)
On April 20, 2005, FIHH transferred title to the property by quitclaim
deed to Denise Harris, "a Married Woman as her sole and separate
property whose post office address is 3430 Grace Avenue, St. Louis, MO
63116 . . . ."[1]  Pierre and Denise Harris each signed as Members of
FIHH.  (Doc. 38, Ex. 4.)  After April 20, 2005, there were no other
transfers of the property.  (Doc. 38, Ex. 5 at 7-9.)

On August 22, 2005, AMHIC issued a "Dwelling Property" insurance
policy No. 0770045434914 for the 3430 Grace Ave. property.  The insured
property is described in the policy as "rental."  The named insured on
the policy is Pierre Harris, P.O. Box 688, Florissant, Missouri.  The
insured property is described as 3430 Grace Avenue, St. Louis, MO 63116.
The policy term is from August 22, 2005, to August 22, 2006.  The
coverage for the Grace Ave. property is limited to $170,000, with a
deductible of $1,000.  (Doc. 38, Ex. 6 at 1.)

Among other perils, the policy covered loss caused by hail.  (Doc.
38, Ex. 6 at 9.)  After a hail storm on July 19, 2006, Pierre Harris
filed a claim with AMHIC, alleging damage to the Grace Ave. property.
(Doc. 38, Ex. 7 at ¶¶ 4-5.)  The claim was for a partial loss, and after
an inspection by Arthur Smith, a claims representative, AMHIC paid
plaintiff Harris $5,735.60 for the property damage.  (Doc. 38, Ex. 8 at
12; Doc. 38, Ex. 7 at ¶ 6.)

Sometime in August 2006, after receiving the property damage award,
plaintiff Harris contacted John Grimes, an appraiser.  (Doc. 38, Ex. 9
at 78-80; Doc. 38, Ex. 10 at 48.)  On August 22, 2006, Grimes and Harris
entered into a two-page "Contract For Personal Service."  (Doc. 38, Ex.
11.)  Under the contract, Harris retained Grimes

---

[1] In her pretrial deposition Denise Harris testified that despite
the language of the quitclaim deed she "understood" that she and her
husband both owned the Grace Ave. property.  She further testified that
this belief was based upon financing documents.  "I believe sometime
when the mortgage come in they acknowledge myself and my husband."
Denise Harris added that, "[w]hen I get the mortgage statements or . . .
[Chase] needs to speak with us, they may put both of our names . . . ."
However, she agreed that all of the available title documents indicate
that after the April 20, 2005 quitclaim deed she was the only owner of
3430 Grace Ave., and that after that date Pierre Harris was not an owner
of the property.  (Doc. 38, Ex. 5 at 9, 10-11, and 13.)  Pierre Harris
testified during his deposition that he believed he and his wife each
owned the Grace Ave. property for investment purposes and in fact had
rented it.  (Doc. 38, Ex. 9 at 6-8.)

>     as his representative and appraiser in an appraisal action
>     under and according to the provisions of a policy of
>     insurance CONCERNING A CLAIM FOR HAIL AND WINDSTORM AND
>     LIGHTNING DAMAGE occurring to the real property located at
>     3430 through 3432 Grace Avenue . . . [and] occurring to the
>     real property located at 4914 Hooke Avenue, St. Louis City,
>     Missouri . . . .

(Doc. 38, Ex. 11 at 1.)  By this contract Harris agreed to pay Grimes "an amount equal to 15% of the final appraised value of the loss and damage" to both properties "caused by either hail and windstorm and, or lightning and all consequential loss sustained thereto on account of hail and windstorm and, or lightning including, but not limited to loss of use, if any."  (Id.)  By the contract, Harris authorized Grimes to act as his "attorney-in-fact to perform and do any act required to be done in regards to the appraisal of damage done to the property, up to [and] including final settlement of all matters relating to" the two properties.  (Id.)  Further, Grimes agreed "to represent and act as appraiser for [Harris] . . . in an action for appraisal under the provisions of the policy of insurance concerning [the two properties] . . . ."  Grimes also agreed to "actively pursue the matter of appraisal to a full conclusion based upon a fair and equitable determination of the loss and damage sustained to each property."  (Id.)  The written agreement also provided for the non-refundable initial payment by Harris to Grimes of $300 for each of the two properties, which would be deducted from the final 15% fees.  ( Id. at 1-2.)

During one of their conversations, Grimes told Pierre Harris that he could be awarded damages for vexatious refusal to pay if a court determined that AMHIC had not properly evaluated the loss.  (Doc. 38, Ex. 10 at 6; Doc. 38, Ex. 9 at 21.)  After speaking with Harris, Grimes inspected the Grace Ave. property.  During this initial inspection, and based on Harris's statements, Grimes expressed an informal opinion about the extent of the damage, but did not conduct a formal appraisal at the time.  (Doc. 38, Ex. 8 at 26.)

Based on Grimes's informal opinion, information gained from city contractors, and his own observations, Harris came to believe that AMHIC's damage award was insufficient.  (Doc. 38, Ex. 9 at 15.)  With the help of Mr. Grimes, Pierre Harris sent Arthur Smith, the AMHIC Claim Adjustor, an "Appraisal Demand Letter" dated October 3, 2006.  In the letter, Harris demanded that "the loss and actual cash value be set by

appraisal according to the provisions of [Missouri] Department of Insurance Regulation 20 CSR 500-1.100(2)(A) . . . ." (Doc. 38, Ex. 12 at 1.) In Harris's opinion, the award failed to consider damage to the front porch roof deck, gutters and downspout, parapet wall, and to the cornice. (Doc. 38, Ex. 12 at 1; Doc. 38, Ex. 8 at 20.) Also, Harris stated that he had selected John Grimes as his appraiser. (Doc. 38, Ex. 12 at 2.) This was the first of several letters exchanged between the parties and their representatives. (See Doc. 38, Exs. 12-14, Exs. 17-24.)

In an October 12, 2006, letter to Harris, Smith accepted the conditions of Harris's letter, and agreed to attempt to settle the claim through an informal appraisal process. The letter scheduled a second inspection of the Grace Ave. property, which occurred on October 18, 2006. (Doc. 38, Ex. 13; Doc. 38, Ex. 7 at ¶ 16.)

On October 19, 2006, Smith wrote to Harris, informing him that he had met with Grimes, but that the two parties were unable to settle the insurance claim. Smith informed Harris that the formal appraisal process had begun.[2] As part of the formal appraisal process, each party was to choose a competent appraiser within twenty days of receiving a written request from the other. If the appraisers were unable to reach an agreement concerning the amount of the loss, the appraisers would submit their differences to an umpire. If the respective appraisers were able to reach an agreement, that amount would be the amount of the loss. (Doc. 38, Ex. 14.)

On October 25, 2006, AMHIC appointed Michael Dooling as its appraiser. (Doc. 38, Ex. 15 at 4.) Dooling testified in his deposition that he tried to call Grimes on his cell phone that day, but received a message that the customer was unavailable and that the phone would not accept a voicemail. Dooling testified that, on October 26, 2006 and again a few days later, he tried calling Grimes's cell phone, but received the same message. (Id. at 5-6.)

In a letter dated October 25, 2006, but with a fax heading dated November 25, 2006, AMHIC notified Grimes that it had appointed Michael

---

[2]AMHIC asserts that the formal appraisal process began on October 18, 2006, after the two parties were unable to settle the claim. (Doc. 38, Ex. 14 at 1.) Harris asserts that the formal appraisal process began on October 10, 2006, when AMHIC received Harris's appraisal demand letter. (Doc. 38, Ex. 17; Doc. 43, Ex. B at 9.)

Dooling as its appraiser. (Doc. 38, Ex. 16 at 1.) Grimes testified in his deposition that he did not receive this letter around October 25 and that he asked Smith to show evidence of that mailing which he did not receive until late November 2006. (Doc. 43, Ex. B at 11-12.)

On October 25, 2006, Grimes conducted an appraisal of the Grace Ave. property. (Doc. 38, Ex. 10 at 13.) In a letter to AMHIC, dated November 20, 2006, Grimes stated that AMHIC had failed to timely notify him of its selected appraiser, and had therefore waived its right to participate in the appraisal. (Doc. 38, Ex. 17 at 4.) In that letter, Grimes calculated Harris's damage award as $75,490.86, plus statutory penalties of interest and vexatious refusal and delay.[3] In an attachment to the letter, Grimes purported to enter the damage award against AMHIC. (Id. at 8.)

By letter dated November 25, 2006, AMHIC advised Grimes that it had selected Michael Dooling as its appraiser. (Doc. 38, Ex. 18.) In a letter to Harris dated November 28, 2006, AMHIC explained that Dooling was having difficulty reaching Grimes, and that any delays in the appraisal process were the result of these difficulties.[4] (Doc. 38, Ex. 19.)

By letter dated December 5, 2006, to AMHIC, plaintiff Harris demanded payment of $75,490.86, plus interest and a penalty for vexatious refusal and delay. (Doc. 38, Ex. 20.) Grimes helped Harris write the letter. (Doc. 38, Ex. 8 at 20-21.)

By letter dated December 12, 2006, to Harris, AMHIC explained that Grimes had denied Dooling access to the property. The letter concluded by asking Harris to contact Dooling directly, and to schedule an inspection of the Grace Ave. property. (Doc. 38, Ex. 21.) In a letter dated December 13, 2006, AMHIC declined Harris's demand for $75,409.86 in damages. This letter also noted Dooling's attempts to contact Grimes, and again asked Harris to contact Dooling. (Doc. 38, Ex. 22.)

---

[3]AMHIC argues that Grimes did not calculate the actual cash value of the property as part of his appraisal. (Doc. 38, Ex. 8 at 14.) Harris argues that Grimes calculated the actual cash value of the property in determining the damage award. (Doc. 38, Ex. 18 at 7.)

[4]AMHIC argues that Grimes refused Dooling access to the property. (See Doc. 38, Ex. 15 at 7.) Harris argues that Dooling did not contact Grimes until November 27, 2006. (See Doc. 43, Ex. D at 1-2.)

Harris did not call Dooling to schedule a time for him to inspect the property. (Doc. 38, Ex. 9 at 27.)

In a letter dated January 19, 2007, Arthur Smith told John Grimes that AMHIC still wished to continue the appraisal process. Smith asked Grimes to contact Dooling. (Doc. 38, Ex. 23.) In a letter dated February 18, 2007, AMHIC wrote to Harris, requesting that either he or Grimes contact Michael Dooling. (Doc. 38, Ex. 24 at 1.) According to Harris, Grimes did not make any attempt to contact Smith to continue the appraisal process. (Doc. 38, Ex. 9 at 30.) Harris also did not call Dooling to schedule a time for him to inspect the property. (Id. at 27.)

On February 22, 2007, Harris commenced this lawsuit, alleging breach of contract and vexatious refusal to pay. (See Doc. 1 at 6, 13.) Grimes referred Harris to his attorney in this case. (Doc. 38, Ex. 8 at 25.)

The policy issued by AMHIC for the Grace Ave. property uses Dwelling Property Basic Form DP-1 (07/88). The brief introductory portion of the policy defines "you" and "your" as the "'named insured' shown in the Declarations and the spouse if a resident of the same household." (Doc. 38, Ex. 6 at 7.) The Conditions portion of the policy limits policy liability to the amount of the interest of the insured (described generally by the provision as the "insurable interest"). (Id. at 10.)[5]

The insurance policy also contains the following relevant provisions:

> **4. Your Duties Afer Loss.** In case of a loss to covered property, you must see that the following are done:
> . . .
> **d.** as often as we reasonably require:

---

[5]Although the policy coverage sought by plaintiff is not contained in it, the Premises Liability Endorsement defines "insured":

    3.  Insured means you and, if an individual, the following
        residents of your household:
        a.   your relatives;
        b.   any other person under the age of twenty-one who
    is       in the care of any person named above.

(Id. at 18.)

>      **(1)**   show the damaged property.
>
> *   *   *
>
> 5.   **Loss Settlement.**   Covered property losses are settled at actual cash value at the time of loss but not more than the amount required to repair or replace the damaged property.

(<u>Id.</u> at 10-11.)

The policy included a "Dwelling Property Special Provisions - Missouri" endorsement which substituted the following conditions and appraisal procedure for the ones in the main text of the policy:

**CONDITIONS**

> 3.   **Concealment or Fraud.**   With respect to all persons insured under this policy, we provide no coverage for loss if, whether before or after a loss, one or more persons insured under this policy have:
>
> a.   Intentionally concealed or misrepresented any material fact or circumstance;
> b.   Engaged in fraudulent conduct; or
> c.   Made false statements;
>
> relating to this insurance.
>
> 8.   **Appraisal.**   In case you and we shall fail to agree as to the actual cash value or the amount of loss, then, on the written demand of either, <u>each shall select a competent and disinterested appraiser</u> and notify the other of the appraiser selected within twenty days of such demand.  The appraisers shall first select a competent and disinterested umpire; and failing for fifteen days to agree upon such umpire, then, on request of you or us, such umpire shall be selected by a judge of a court of record in the state and county (or city if the city is not within a county) in which the property covered is located.  The appraisers shall then appraise the loss, stating separately actual cash value and loss to each item; and, failing to agree, shall submit their differences, only, to the umpire.  The umpire shall make the award within thirty days after the umpire receives the appraisers' submissions of their differences.  An award in writing, so itemized, of any two when filed with us shall determine the amount of actual cash value and loss.  Each appraiser shall be paid by the party selecting such appraiser and the expenses of appraisal and umpire shall be paid by the parties equally.
>
> 11.   **Suit Against Us**.   No action can be brought unless the policy provisions have been complied with and the action is started within ten years after the date of loss.

(<u>Id.</u> at 25-26) (emphasis added).

## IV. DISCUSSION

In its motion for summary judgment, AMHIC argues there are no genuine issues of material fact, and that both the insurance policy and Grimes's appraisal award are void and unenforceable for a number of reasons: (1) the insurance policy is void because plaintiff Harris did not have an insurable interest in the Grace Ave. property on the date of the loss or when the policy was issued; (2) there is no coverage under the policy because Harris misrepresented material facts relating to his interest in the property; (3) Grimes's appraisal award is void because he was an interested appraiser; (4) Grimes's appraisal award is void because Harris proceeded unilaterally; (5) Grimes's appraisal award is void because he did not determine an actual cash value in his appraisal; and (6) plaintiff Harris refused to grant AMHIC access to the property. (Doc. 38.)

In response, plaintiff Harris argues that he has an insurable interest in the Grace Ave. property, and that the policy is valid and enforceable. In particular, Harris notes that the policy defines the insured to include the insured's spouse. Harris also argues that Grimes was a competent and disinterested appraiser, because he did not have a substantial business relationship with Grimes. Finally, Harris argues that Grimes's appraisal award should be enforced because he determined an actual cash value, and because AMHIC failed to adhere to the guidelines for the formal appraisal process. (Doc. 43.)

**Rules of Decision**

A federal district court sitting in diversity jurisdiction must apply the rules of decision that would be applied by the courts of the state in which it sits, including the initial choice of the applicable substantive law. <u>Erie R.R. Co. v. Tompkins</u>, 304 U .S. 64, 78 (1938); <u>see also</u> <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941).

Missouri choice of law rules follow the "most significant relationship" test, found in Section 188 of the Restatement (Second) of Conflicts of Laws, for claims concerning the breach of insurance policy provisions. <u>Superior Equipment Co. v. Md. Cas. Co.</u>, 986 S.W.2d 477, 480 (Mo. Ct. App. 1998). Under this test, the court balances several factors to determine which state has the most significant relationship to the action. <u>Id.</u> These factors include: (a) the place of

contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. Id. "In cases involving surety or casualty insurance . . . the most important factor is the state which the parties contemplated as the principal location of the insured risk." Id. According to the Restatement, the principal location of the insured risk is the state where the risk will be during the major portion of the insurance period. Id. (citing Restatement (Second) of Conflicts of Laws, Section 193).

In the case at bar, the policy recites that plaintiff Harris, the named insured, resides in Florissant, Missouri; the agent is located in Lee's Summit, Missouri; the broker is located in Sunset Hills, Missouri; and the insured property is located in St. Louis, Missouri. (Doc. 38, Ex. 6 at 31.) The policy does not provide for the application of any particular jurisdiction's law, but it substitutes a special appraisal procedure for Missouri policies in place of the main policy language. The court concludes that the courts of Missouri would apply the law of Missouri in this action and the parties themselves for the most part invoke the law of Missouri.

**Insurable Interest**

AMHIC argues that Harris did not have an insurable interest in the Grace Ave. property and summary judgment is therefore appropriate.

To recover under a fire insurance policy, the insured must prove he had an insurable interest in the property at the time the insurance contract was made, and at the time the loss was sustained. Dimmitt v. Progressive Cas. Ins. Co., 92 S.W.3d 789, 792 (Mo. 2003). An insurable interest does not require title to the property. JAM Inc. v. Nautilus Ins. Co., 128 S.W.3d 879, 887 (Mo. Ct. App. 2004). Instead, an insurable interest may be derived from possession, enjoyment, or profits from the property. Dimmitt, 92 S.W.3d at 792. Other benefits growing out of the property or dependent on the property may also create an insurable interest. Id. In short, a person may have an insurable interest in property if he will "derive pecuniary benefit or advantage from its preservation, or will suffer pecuniary loss or damage from its destruction . . . ." G.M. Battery & Boat Co. v. L.K.N. Corp., 747

S.W.2d 624, 627 (Mo. 1988). As long as there is any substantial possibility that the insured will suffer a loss from the destruction of the property, "Missouri courts make every effort to find insurable interest, and to sustain coverage . . . ." Dimmitt, 92 S.W.3d at 792.

Applying these broad principles, the Missouri courts have found insurable interests in a variety of circumstances. 30 Missouri Practice: Insurance Law and Practice § 11.6 (1997 & Supp. 2008) (listing several cases that found an individual had an insurable interest absent title to the property). For instance, a divorced wife who remained liable for the property's debts had an insurable interest in the property, even though she had conveyed the property (as part of a divorce decree) to her husband by quitclaim deed. DeWitt v. Am. Family Mut. Ins. Co., 667 S.W.2d 700, 704, 706 (Mo. 1984). A shareholder has an insurable interest in the corporate property. JAM Inc., 128 S.W.3d at 888. An insurable interest also exists where there is an agreement to insure the property. Id. at 889. In other words, a person's obligation to obtain insurance for a property creates an insurable interest in that property for the amount insured. Id. at 891. Living in an insured motor home, absent proper title, can create an insurable interest. Dimmitt, 92 S.W.3d at 793. A mother's promise to convey property to her son, who was building a home on the property, gave the son an insurable interest in the property. Bernhardt v. Boeuf & Berger Mut. Ins. Co., 319 S.W.2d 672, 673-74 (Mo. Ct. App. 1959); see also Wisecup v. Am. Ins. Co. of Newark, N.J., 172 S.W. 73, 74 (Mo. Ct. App. 1914) (noting that husband had not shown that his wife promised to reconvey the insured property to him, and concluding the husband did not have an insurable interest in the wife's property). Even a lessee had an insurable interest in the rental property, where it had the option to purchase and its rental payments would be applied to the purchase price. G.M. Battery & Boat Co., 747 S.W.2d at 627.

On April 20, 2005, FIHH transferred title to the Grace Ave. property by quitclaim deed to Denise Harris "as her sole and separate property." This transfer conveyed FIHH's complete legal interest in the Grace Ave. property to Denise Harris. In Missouri, a quitclaim deed conveys to the grantee any title and interest the grantor had in the premises. Reasor v. Marshall, 221 S.W.2d 111, 115 (Mo. 1949). In this case, the date of loss was July 19, 2006.

A husband does not automatically have an insurable interest in his wife's separate property. Wisecup, 172 S.W. at 73-74. However, in their deposition testimony, the plaintiff and his wife indicated that they understood that they both owned the Grace Ave. property, that plaintiff Pierre Harris had signed financing documents for the Grace Ave. property, and that the property was generating rental income for Harris and his wife. This record indicates that there is a "substantial possibility" that Harris had a substantial financial interest in the Grace Ave. property and therefore an insurable interest at the time the policy was taken out and at the time of the loss. See Dimmit, 92 S.W.3d at 792.

Therefore, summary judgment on this basis in inappropriate.

**Material Misrepresentation**

AMHIC argues that there is no coverage under the policy because Harris misrepresented material facts relating to his ownership of the Grace Ave. property. In particular, AMHIC notes that the terms of the policy provide no coverage if the insured intentionally concealed or misrepresented any material fact or circumstance, engaged in fraudulent conduct, or made a false statement.

In her deposition, Denise Harris testified that she had not known that her husband Pierre Harris did not own the Grace Ave. property until the time of her deposition, when she was shown the title documents. And despite the quitclaim deed, Denise Harris understood that she and her husband both owned the Grace Ave. property. Pierre Harris also testified that he believed he and his wife each owned the Grace Ave. property.

The Harrises' deposition testimony creates a genuine issue of material fact as to whether Pierre Harris misrepresented material facts relating to the ownership of the Grace Ave. property. Accordingly, summary judgment on this basis is also inappropriate.

**Disinterested Appraiser**

AMHIC argues that John Grimes's appraisal award is void because he was an interested appraiser. In addition, AMHIC argues that appointing an interested appraiser breached conditions of the insurance policy, making summary judgment appropriate.

Under Missouri law, when parties agree in an insurance policy to determine the amount of loss by an appraisal process, the individuals selected to act as appraisers must not be interested, biased, or prejudiced. <u>Orr v. Farmers Mut. Hail Ins. Co. of Mo.</u>, 201 S.W.2d 952, 957 (Mo. 1947). The policy language quoted above requires that the appraisers be competent and disinterested. An appraiser may become interested, biased, or prejudiced in a number of ways. <u>See</u> <u>id.</u> For example, an individual "who is frequently or habitually employed by insurers as an appraiser and who . . . understands that he is acting in their interests is not disinterested." <u>Id.</u> An appraiser may also become interested or biased by acting as a real estate agent or broker in the sale of the plaintiff's insured property. <u>Beltramo Enters. II, Inc. v. United Fire & Cas. Ins. Co.</u>, No. 2:04 CV 65 AGF, 2006 WL 744304, at *6 (E.D. Mo. March 23, 2006). In short, an appraiser becomes interested or biased by having a direct or indirect financial interest in the outcome of the appraisal. <u>Schwartzman v. London & Lancashire Fire Ins. Co., Ltd., of Liverpool, Eng.</u>, 2 S.W.2d 593, 594 (Mo. 1927).

On August 22, 2006, plaintiff Pierre Harris entered into a written contract with John Grimes. Under the contract, Grimes agreed to perform an appraisal of the Grace Ave. property and the Hooke property, and to act as Harris's "attorney-in-fact." In exchange, Harris paid Grimes $300, and agreed to pay him 15% of the final appraised value of the Grace Ave. property. After Grimes performed his initial inspection, Harris wrote an appraisal demand letter to Arthur Smith at AMHIC. Grimes helped Harris write this letter. A few months later, in December 2006, Harris wrote another letter to AMHIC, demanding payment of Grimes's appraisal award. Once again, Grimes helped Harris write this letter. Finally, in February 2007, Harris brought this action against AMHIC, with Grimes having referred Harris to his attorney. When the judicial petition was filed, Grimes had not yet completed the appraisal of the Hooke property.

The proffered evidence is unequivocal that Grimes was not a disinterested appraiser as required by Missouri law and the terms of the insurance policy. To be sure, appraisers are not required to be entirely impartial. <u>Cent. Life Ins. Co. v. Aetna Cas. & Sur. Co.</u>, 466 N.W.2d 257, 261 (Iowa 1991). "The appraisers do not violate their commitment by acting as advocates for their respective selecting

parties." Id. At the same time, appraisers must be in a position to act fairly and to be free from suspicion or unknown interest. Id. As a result, the selecting parties may pay a fee to their appraiser or arbitrator. See Borst v. Allstate Ins. Co., 717 N.W.2d 42, 55 (Wis. 2006). Indeed, "this is a typical aspect of arbitration."[6] Id.

While an appraiser may receive a flat or hourly fee, he may not receive a contingent fee; the appraiser's fee may not be based on a percentage of the settled loss. See Cent. Life Ins., 466 N.W.2d at 261-62; Aetna Cas. & Sur. Co. v. Grabbert, 590 A.2d 88, 92 (R.I. 1991); but see Rios v. Tri-State Ins. Co., 714 So.2d 547, 549-50 (Fla. Dist. Ct. App. 1998) (finding contingent fee arrangement was not improper where the policy required the parties to select only "independent" and "competent" appraisers, the policy did not prohibit contingent fees, and the contingent fee did not violate the Code of Ethics for Arbitrators); Hozlock v. Donegal Cos./Donegal Mut. Ins. Co., 745 A.2d 1261, 1265-66 (Pa. Super. Ct. 2000) (finding contingent fee arrangement was not improper where the policy did not call for a "disinterested" appraiser). When an appraiser is paid through a contingent fee arrangement, the appraiser receives a direct financial interest in the dispute and becomes an interested party. Cent. Life Ins., 466 N.W.2d at 261. "[T]he party-appointed arbitrator's contingent fee gave him a direct financial interest in the award that was absolutely improper . . . ." Grabbert, 590 A.2d at 92.

In this case, Grimes's fee was $300 and 15% of the final appraised value. This contingent fee gave Grimes a direct financial interest in the ultimate appraisal award, a fee that would increase as the appraisal amount increased. Cent. Life Ins., 466 N.W.2d at 261-62; Grabbert, 590 A.2d at 92. Under Schwartzman, an appraiser may not receive a direct financial interest in the outcome of the appraisal. Schwartzman, 2 S.W.2d at 594. Under Central Life Insurance, the contingent fee points to prejudice on Grimes's part.

Grimes also acted as Harris's "attorney-in-fact," assisting Harris in writing two letters to AMHIC, and referring Harris to the lawyer who

---

[6]Cases involving interested arbitrators have been cited as persuasive authority for cases concerning interested appraisers. Cent. Life Ins., 466 N.W.2d at 261. In fact, in Schwartzman, the court referred to the appraiser as an arbitrator. Schwartzman, 2 S.W.2d at 594.

brought this action. A substantial and ongoing attorney-client relationship between an arbitrator and the party appointing him renders the arbitrator partial. Borst, 717 N.W.2d at 54 ("[T]he fact that [the arbitrator] had a substantial, ongoing attorney/client relationship with [the insurer] leads us to conclude, as a matter of law, that [the arbitrator] demonstrated evident partiality such that the arbitration award must be vacated.") Grimes's agreement to act as Harris's "attorney-in-fact" points to prejudice on his part. Id.

Finally, Grimes agreed to perform an appraisal also on the Hooke property. "Current or prospective financial dealings with a party are well recognized as grounds for an arbitrator's disqualification." Gebers v. State Farm Gen. Ins. Co., 45 Cal. Rptr. 2d 725, 728 (Cal. Ct. App. 1995). In Gebers, the insurer's appraiser had been retained to act as an expert witness in two of the insurer's pending cases. Id. The court found this "ongoing litigation work" gave the appraiser a direct financial interest in the outcome of the appraisal, and cast considerable doubt on the appraiser's ability to act impartially. Id. Grimes's agreement to perform another appraisal for Harris points to prejudice on his part.

The contract between Grimes and Harris promised Grimes 15% of the final appraised value of the property, that Grimes would act as Harris's attorney-in-fact, and that Grimes would perform another appraisal for Harris. Taken together, these facts indicate Grimes was not a disinterested appraiser as required by the law and by the policy. Grimes's appraisal award of $75,409.86 in damages is therefore null and void. See id. (vacating award of interested appraiser, and remanding for a new appraisal); Cent. Life Ins., 466 N.W.2d at 262, 264 (ordering district court to declare appraisal award null and void, and remanding for further proceedings to determine the amount due under the insurance policy); Borst, 717 N.W.2d at 54, 58 (vacating award of interested arbitrator, and remanding for a new arbitration).

The interest of Grimes in the outcome of the appraisal proceedings requires that his appraisal be vacated and set aside.

**Actual Cash Value**

AMHIC argues Grimes failed to determine an actual cash value in his appraisal. AMHIC argues the appraisal award is therefore void, and that summary judgment is appropriate.

Under the terms of the insurance policy, a covered loss is to be settled for the actual cash value at the time of the loss and the appraiser is required to appraise the loss, "stating separately actual cash value and loss to each item." (Doc. 38, Ex. 6 at 11, 25.) Under Missouri law, actual cash value is defined as the difference between the reasonable value of the property immediately before and after the loss. Porter v. Shelter Mut. Ins. Co., 242 S.W.3d 385, 387 n. 2, 390 (Mo. Ct. App. 2007). This definition stems from the partial loss statute, Mo. Rev. Stat. § 379.150. JAM Inc., 128 S.W.3d at 896; Fire Ins. Exch. v. Bowers, 994 S.W.2d 110, 112 (Mo. Ct. App. 1999). In cases of partial loss, the insured has the burden to prove the value of the property both before and after the loss. Bowers, 994 S.W.2d at 112. Any dispute as to the monetary amount of the damage may be submitted to a jury. Id.

In this case, John Grimes testified that he did not determine an actual cash value, even though the loss was a partial loss. (Doc. 38, Ex. 8 at 12.) At the same time, Grimes also testified that he relied on the valued policy statute, Mo. Rev. Stat. § 379.140, in determining that the value of the property before the loss was $170,000. (Doc. 38, Ex. 10 at 16-24.) Grimes noted that he did not conduct any independent investigation to arrive at the $170,000 amount. (Id. at 18.) Grimes referred to this amount as the "actual cash value of the property" before the loss. (Id.)

Missouri Revised Statute § 379.140 is a valued policy statute. Polytech, Inc. v. Affiliated FM Ins. Co., 21 F.3d 271, 273 (8th Cir. 1994). When a valued policy statute applies, the insurer must accept that the value of the insured property at the time the policy was written is equal to the amount of insurance for which the policy was written. Id. The valued policy statute does not apply, however, unless the loss is a total loss. JAM Inc., 128 S.W.3d at 893; see also Wells v. Mo. Prop. Ins. Placement Facility, 653 S.W.2d 207, 210 (Mo. 1983) ("Section 379.140 also establishes a measure of damages for the partial loss of real property, but our courts have largely ignored that

provision and have instead relied on § 379.150 . . . for the measure of damages in the case of a partial loss . . . .").

In his deposition, Grimes stated that he did not determine an actual cash value of the loss. Grimes also testified that he relied on the valued policy statute to determine the value of the property before the loss, even though the loss was deemed a partial loss. Looking to Missouri law and the terms of the policy, Grimes did not use the proper methodology for arriving at his calculation.

When an appraiser fails to use the proper method for calculating damages, the appraiser's testimony may be excluded at trial, because an appraisal based upon the wrong standard is not relevant proving the amount of loss based upon the correct standard. See Fed. R. Evid. 401, 401. An appraisal based upon an incorrect standard will not sustain the non-moving party in opposition to a motion for summary judgment. Plaintiff may not rely upon Grimes's appraisal to sustain his claim for damages.

**Access to the Property**

AMHIC argues that Harris failed to grant AMHIC and its appraiser access to the property, violating the terms of the policy.

Under the terms of the insurance policy, Harris had an obligation to show the damaged property as often as AMHIC reasonably required. (Doc. 38, Ex. 6 at 10-11.) AMHIC argues that Grimes refused to provide its appraiser, Michael Dooling, access to the property. In response, John Grimes testified that he met with Arthur Smith on October 18, 2006, to inspect the Grace Ave. property. (Doc. 43, Ex. B at 9.) In addition, Grimes testified that Dooling did not contact him until November 27, 2006 – several days after Grimes had already entered his damage award. (Doc. 43, Ex. B at 11-12, 17-18; Doc. 43, Ex. D.)

This testimony creates a genuine issue of material fact as to whether Pierre Harris failed to grant access to the property as reasonably required. Accordingly, summary judgment on this basis is inappropriate.

**Unilateral Action on the Policy**

Sometime in October 2006, AMHIC and Harris began the formal appraisal process. The formal appraisal process was unsuccessful, as

the parties were unable to reach an agreement on the amount of damages. Each side faults the other for the breakdown of the formal appraisal process.

The insurance policy provides for the appraisal process. The insurance policy also states that no lawsuit can be brought until the policy provisions have been complied with. (Doc. 38, Ex. 6 at 25-26.) The cardinal question becomes whether the plaintiff must go through a successful appraisal before he may sue under the insurance policy. See Sec. Printing Co. v. Conn. Fire Ins. Co. of Hartford, Conn., 240 S.W. 263, 269 (Mo. Ct. App. 1922).

In Security Printing Company, the insurance policy provided for an appraisal process and noted that no lawsuit could be brought on the policy until the insured had fully complied with all of the policy's requirements. Id. at 268. The court noted that where the appraisal process failed, but the failure was not the fault of the insured, the plaintiff could bring his lawsuit. Id. Where the plaintiff has, in good faith, complied with the terms of the policy, "and is not chargeable with the failure of the appraisers to make a valid appraisal, his right of action on the policy would seem to be complete." Id.; see also Carp v. Queen Ins. Co. of Am., 79 S.W. 757, 760 (Mo. Ct. App. 1904) ("The [appraisal] requirement cannot be used as a means to baffle the insured, or indefinitely postpone his right to sue.").

On the other hand, if the insured or his chosen appraiser acts in bad faith and causes the appraisal process to fail, then the lawsuit must fail as well. Mason v. Fid. Phenix Ins. Co., 258 S.W. 759, 761 (Mo. Ct. App. 1924) (unpublished opinion). In particular, undue delay in choosing an umpire, unfair and arbitrary conduct, or other acts of bad faith, would be defenses to any lawsuit. Id. Whether the failure to arbitrate rests with the plaintiff or his appraiser is a question for the jury. Id.; Carp, 79 S.W. at 760-61.

In this case, AMHIC argues that plaintiff Harris proceeded unilaterally with his appraisal determination in violation of the policy provisions. Plaintiff faults defendant for the breakdown of the appraisal process. After an unsuccessful process, Harris filed this lawsuit. Whether Pierre Harris or John Grimes acted in bad faith, and whether their conduct is as a defense to the lawsuit, will be questions for the jury to determine at trial.

**Counterclaim**

AMHIC has filed an amended counterclaim for a declaratory judgment as to the parties' rights and obligations under the policy. Defendant's motion for summary judgment did not treat its counterclaim. The counterclaim remains to be determined.

### V. ORDER

For the foregoing reasons and as set forth above,

**IT IS HEREBY ORDERED** that the motion of defendant for summary judgment (Doc. 37) is sustained as to certain issues and otherwise denied.

**IT IS FURTHER ORDERED** that a status and scheduling hearing is set for Friday, June 20, 2008, at 2:00 p.m.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on May 30, 2008.